IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| EDWIN C. OAKS, | ) | CASE NO. 5:10CV2054 |
| | ) | |
| Plaintiff, | ) | JUDGE LESLEY WELLS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Edwin C. Oaks ("Oaks") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his applications for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act), 42 U.S.C. §§ 416(i) and 423, and Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1381 *et seq.*  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).[1]

The Administrative Law Judge ("ALJ") failed to consider adequately Oaks' physical impairments in reaching her decision that Oaks was not disabled.  Specifically, the ALJ's analysis does not provide any indication that, when she determined Oaks' residual functional capacity ("RFC"), she accounted for evidence as to a worsening of his diabetes mellitus and peripheral neuropahy in 2007 and 2008.  For that and the other reasons set forth below, the final decision of the Commissioner should be REVERSED and REMANDED.

---

[1] Under Local Rule 7.1(f), the page limitation for memoranda for matters assigned to the administrative track is 20 pages.  The font size of Oaks' brief on the merits is less than twelve points in size, as evidenced by the small typeface throughout the brief.  In the future, counsel shall use twelve point font when complying with Local Rule 7.1(f).

1

# I. Procedural History

On April 12, 2005, Oaks filed his application for DIB,[2] alleging a disability onset date of December 5, 2004. Tr. 86-88. Oaks claimed that he was disabled because of a combination of impairments, including that all of his toes on both feet were amputated due to frostbite, diabetes, and neuropathy. Tr. 46-47. The state agency denied Oaks' claim initially on August 31, 2005, (Tr. 35), and upon reconsideration on November 14, 2005. Tr. 36. On December 14, 2005, Oaks filed a written request for a hearing (Tr. 45) and, on May 6, 2008, a hearing was held before ALJ Janice Bruning. Tr. 282-309. In a decision dated August 12, 2008, the ALJ determined that Oaks was not disabled or entitled to benefits. Tr. 18-26. Oaks requested review of this decision by the Appeals Council on August 28, 2008. Tr. 14. On April 26, 2010, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. Tr. 6-9. [3]

# II. Evidence

## A.    Personal and Vocational Evidence

Oaks was born on April 24, 1956, and was 52 years old at the time of the hearing. Tr. 86. He graduated from high school and is able to communicate in English. Tr. 142, 286. Oaks has past relevant work experience as a carpenter, cabinet maker, and greenskeeper. Tr. 102, 287. At the time of the hearing, he shared a house with his brother. Tr. 286.

---

[2]According to the ALJ's decision, it appears that Oaks filed applications for DIB and SSI in April 2005. Tr. 18, 35-36. However, in Oaks' fact sheet, he states that he only filed a DIB application, and a copy of the SSI application is not contained in the record. In any event, the ALJ considered that Oaks filed DIB and SSI applications (Tr. 18), and denied both of these applications in a decision dated August 12, 2008. Tr. 26. As Oaks' insured status expired on March 31, 2009 (Tr. 76), after the date of the ALJ's decision, the entire period was considered for both applications.

[3] In his brief on the merits, Oaks states that he was awarded SSI and DIB benefits on subsequent applications. Doc. 17, p. 1. Specifically, Oaks states that he was found disabled due to his diabetic neuropathy as of August 13, 2008, which was the day after the ALJ issued her decision denying Oaks' applications for benefits on his original applications. Doc. 17, p. 1. The period at issue then is December 5, 2004, the alleged disability onset date, to August 12, 2008.

**B.     Medical Evidence**

**1.     Treating Physicians**

On December 4, 2004, Oaks suffered frostbite while hunting.  Tr. 232.  On December 6, 2004, he sought treatment at Akron City Hospital and was seen by Amy Hite, M.D., and Eric R. Jopperi, D.O.  Tr. 232.  Oaks was diagnosed with frostbite on both feet.  Tr. 233.  He was also seen by diabetic education and was instructed to follow up with this program.  Tr. 234.  Oaks was discharged on December 10, 2004, and was instructed to follow up with Dr. Jopperi on December 20, 2004.  Tr. 234.

On December 20, 2004, Oaks saw Dr. Jopperi for his frostbite.  Tr. 152.  Dr. Jopperi noted Oaks' toes were black and very hard, and that his feet were oozing.  Tr. 152.   He referred Oaks to a surgeon for his toes.  Tr. 153.  Dr. Jopperi also diagnosed Oaks with diabetes and stated that he would follow up with Oaks about diabetes education.  Tr. 153.

**Dr. Fink**.  On January 5, 2005, Oaks reported to John A. Fink, M.D., for treatment of his frostbite.  Tr. 158.  Dr. Fink noted that Oaks had dry gangrene in all five toes on his right foot and in the first three toes of his left foot.  Tr. 158.  On January 28, 2005, Dr. Fink performed a bilateral transmetatarsal amputation and removed all of the toes on both of Oaks' feet.  Tr. 158.  On February 14, 2005, Dr. Fink noted that the left foot was virtually healed from the surgery and the right foot was struggling but it appeared that it would heal.  Tr. 158, 197.  By the end of February 2005, Dr. Fink noted the left foot had completely healed but the right foot had a small area of breakdown.  Tr. 158.  On July 13, 2005, Dr. Fink noted that both feet had healed completely.  Tr. 157.

On June 9, 2005, Dr. Fink wrote a letter to the state rehabilitation services commission.  Tr. 156.  He explained that Oaks underwent toe amputations on both feet in January 2005 and

stated that he did not believe Oaks was totally disabled or even partially disabled.  Tr. 156.  Dr. Fink stated that Oaks walked easily and should be able to walk fine with prostheses.  Tr. 156.  He also stated that Oaks should be able to do most jobs, including manual labor, except for carrying things that had a lot of weight.  Tr. 156.  Dr. Fink stated that he did not consider Oaks to be disabled.  Tr. 156.

On October 18, 2005, Dr. Fink wrote a second letter to the state rehabilitation services commission and stated that it took Oaks several months to heal from surgery.  Tr. 155.  Dr. Fink affirmed his prior opinion that he did not believe that Oaks was totally disabled and that, if he was even partially disabled, it would be mild.  Tr. 155.  Dr. Fink again stated that Oaks walked easily and should be able to walk with minimal problems using prostheses that were placed inside his shoes.  Tr. 155.  Dr. Fink stated that Plaintiff should be able to do most jobs including manual labor, but that he could not carry things that had a lot of weight.  Tr. 155.

**Dr. Jopperi**.  Dr. Jopperi was Oaks' primary care physician from December 2004 until sometime in 2007.  On April 11, 2005, Oaks presented to Dr. Jopperi for a follow up visit.  Tr. 150.  Dr. Jopperi noted that there was still some oozing from the remnant of the right great toe, but that it was improving and that Oaks was doing well.  Tr. 150.  On June 27, 2005, Dr. Jopperi noted that Oaks had received his orthotic foot inserts, and that he had some blistering where the forefoot rubbed against the orthotics.  Tr. 194.  On July 21, 2005, Dr. Jopperi reported that Oaks' feet were healing well, but that he had some prosthetic "burning."  Tr. 192.  Dr. Jopperi noted that there were no ulcers present on Oaks' feet.  Tr. 192.

In October 2005, Dr. Jopperi completed a medical information form regarding Oaks.  Tr. 145-47.  He diagnosed Oaks with frostbite of the toes, with status post amputation; diabetes mellitus type 2 ("diabetes"); hypercholesterolemia; hypertriglyceridemia; and hypertension.  Tr.

4

146.  Dr. Jopperi noted that Oaks was first diagnosed with diabetes in December 2004 and that is was a new diagnosis because Oaks had not seen a doctor prior to that.  Tr. 146.  Dr. Jopperi stated that Oaks' wounds from his surgery had healed well.  Tr. 146.  Dr. Jopperi reported that Oaks did not need any further surgical intervention and that he had been fitted for orthotics for his feet.  Tr. 146.  Dr. Jopperi also noted the Oaks' diabetes was well-controlled.  Tr. 147.  When describing any limitations on Oaks' ability to perform sustained work activity, Dr. Jopperi opined that Oaks would have some difficulty with balance and gait after his amputation, but was nonetheless able to ambulate and had no difficulty lifting.  Tr. 147.

In a treatment note dated October 17, 2005, Dr. Jopperi noted that Oaks still had pain in his feet, but that his toes were healing well.  Tr. 188.  On January 24, 2006, Oaks informed Dr. Jopperi that he had lost his job as a cabinet maker because he could not fulfill his duties.  Tr. 184.  Dr. Jopperi noted that Oaks had not been taking his medication as prescribed and that he was unable to afford some of the medication.  Tr. 184.  Dr. Jopperi gave Oaks some drug samples and noted that he would check to see if he could get Oaks involved in some drug programs.  Tr. 184.  On February 10, 2006, Dr. Jopperi saw Oaks and noted that he had not filled his prescription for hydrochlorothiazide because it was too expensive.  Tr. 183.  Dr. Jopperi gave Oaks additional drug samples and referred Oaks to a social worker to help him apply for prescription medication assistance programs.  Tr. 183.

**Dr. Graham.**  Reed Graham, D.P.M., a podiatrist, treated Oaks for a variety of issues after his surgery, including ulcers on his feet.  Tr. 248-49.  On June 28, 2005, Dr. Graham reported that Oaks was doing well and that his feet were healed.  Tr. 249.  Dr. Graham noted that Oaks had plantar pain that was tolerable, and that his blister and heel ulcers were all healed.  Tr. 249.  He discharged Oaks from his care.  Tr. 249.

5

On January 16, 2007, a year and a half since his last appointment, Oaks called Dr. Graham because of ulcers on his feet.  Tr. 249.  Dr. Graham noted that Oaks had special shoes but was not wearing them.  Tr. 249-50.  He also noted that Oaks was taking antibiotics for the last two weeks.  Tr. 249.  Oaks told Dr. Graham that he went hunting three times and was also working construction.  Tr. 249.  Dr. Graham instructed Oaks to do daily dressing changes and gave him another antibiotic.  Tr. 249.  Dr. Graham also referred Oaks to surgical podiatrist for treatment of the ulcerations on his feet.  Tr. 250.  On January 23, 2007, Dr. Graham noted that the ulcerations on Oaks' feet had improved.  Tr. 249.

**Dr. Grossman.**  Oaks began treating with Jordan P. Grossman, D.P.M., a surgical podiatrist, for ulcerations on his feet.  On July 5, 2007, Dr. Grossman noted that Oaks had chronic ulcers on his feet.  Tr. 177.  He also noted decreased circulation and joint limitation secondary to Oaks' ulcers.  Tr. 177.  On July 27, 2007, Dr. Grossman diagnosed chronic neuropathic ulcerations and diabetes mellitus with peripheral neuropathy.  Tr. 238.

On December 21, 2007, Dr. Grossman examined Oaks and noted dense sensory neuropathy on both feet, as well as peripheral keratosis at the plantar aspect of the open neuropathic wounds bilaterally.  Tr. 260.  Dr. Grossman discussed possible foot surgery with Oaks, and recommended that they proceed with the right foot first and, when it is healed adequately, proceed to the left foot.  Tr. 260.  On January 22, 2008, Dr. Grossman performed a revised transmetatarsal amputation on his right foot.  Tr. 258, 260.  At the administrative hearing, Oaks stated that he was scheduled to have surgery on his left foot the week after the hearing, in May 2008.  Tr. 287.

**Dr. Khan.**  Meanwhile, in 2007, Oaks also began treating with Inam Khan, D.O., his new primary care physician, for a variety of issues, including his diabetes.  Tr. 252-54, 268.  On June

5, 2007, Dr. Khan noted that Oaks was extremely non-compliant with his diabetes treatment, and had not taken his medications for more than four months because he lost his insurance.  Tr. 268. Dr. Khan also noted that Oaks had not seen a podiatrist for at least four months.  Tr. 268.  Dr. Khan reported that Oaks had chronic foot ulcers on both feet, with mild erythema and no pus or drainage.  Tr. 268.  Dr. Khan gave Oaks samples of his medications and referrals for lab work and wound care.  Tr. 268.  On July 18, 2007, Oaks informed Dr. Khan that he was seen at a wound clinic and was to have surgery to remove bone spurs on both feet.  Tr. 265.  Dr. Khan noted that Oaks had a large chronic foot ulcer on his right foot and two chronic foot ulcers on his left foot, but none were actively draining pus or fluid.  Tr. 265.  Dr. Khan also reported some very mild erythema around the wound sites, but no pain on palpation.  Tr. 265.

On January 28, 2008, Dr. Khan noted that Oaks was extremely non-compliant with his diabetes medication.  Tr. 253.  Dr. Khan reported that, when he tried to explain to Oaks the devastating consequences of uncontrolled diabetes, Oaks responded with jokes and humor.  Tr. 253.  He stated that Oaks admitted eating candy, brownies, cake, bread, pasta, and peanut butter, and that he did not like vegetables.  Tr. 253.  Dr. Khan surmised that Oaks might have a learning disability, but no overt mental retardation, and that he was in denial about his illness.  Tr. 253. Dr. Khan prescribed Glucophage for diabetes and periodic visits from a nurse practitioner to monitor his care.  Tr. 254).  He also recommended pharmacies with low-cost prescriptions and referred Oaks to a social worker.  Tr. 254.

### 2.    State Agency Physicians

On August 29, 2005, Charles A. Derrow, M.D., a state agency physician, reviewed Oaks' medical records and assessed his physical residual functional capacity.  Tr. 240-46.  Dr. Derrow concluded that Plaintiff retained the capacity for light work that involved lifting twenty

pounds occasionally and ten pounds frequently, standing or walking six hours a day, and sitting

six hours a day.  Tr. 240.  Dr. Derrow also limited Oaks from ever climbing ladders, ropes, or

scaffolds and from concentrated exposure to extreme cold.  Tr. 241-43.  Dr. Derrow cited

medical records from Dr. Fink that showed that both of Oaks' feet had healed and Oaks could

walk easily, with prostheses, and was restricted from heavy lifting, but nothing else.  Tr. 240.

On November 9, 2005, Gary W. Hinzman, M.D., a state agency physician, reviewed Oaks'

updated medical records and agreed with Dr. Derrow's assessment as written.  Tr. 246.

**C.    Earnings Records**

Oaks' earnings records show that he had earnings of $17,966.56 in 2004 and $6,535.30 in

2005 for work at Mr. O's Custom Millwork and Store Fixtures.  Tr. 64-66.  He also had earnings

of $3,073.82 in 2006 and $7,777.00 in 2007 for work at the Prestwick Golf Club.  Tr. 56-57.

**D.    Testimonial Evidence**

**1.    Oaks' Testimony**

Oaks appeared with counsel and testified at the administrative hearing before the ALJ on

May 6, 2008.  Tr. 283-302.  The ALJ asked Oaks about his earnings in 2005 at Mr. O's Custom

Millwork and Store Fixtures, and he responded that the earnings were from short term disability

insurance.  Tr. 288, 300.  Oaks then testified about his job at Prestwick Golf Club in 2006 and

2007.  Tr. 287.  He explained that this job was a seasonal job, at which he would work from

spring to fall mowing grass at the golf course.  Tr. 287.  Oaks stated that he did all of the mowing

while seated on a riding mower.  Tr. 291.  Oaks stated that he worked five days a week, for seven

hours a day.  Tr. 287.  He testified that, at the time of the hearing, he was still working at the golf

course, and that he received unemployment compensation during the winter immediately prior to

the hearing (winter of 2007-2008).  Tr. 286-87.

Oaks testified that his daily activities included cooking for himself (Tr. 293), driving (Tr. 293-94), going to the grocery store and pushing the grocery cart (Tr. 294), washing dishes and doing the laundry (Tr. 294) and watching television (Tr. 297).  Oaks stated that he had a dog and took care of it, but that his brother had to walk the dog.  Tr. 294.  He also testified that he cleaned his house and did the dusting and vacuuming.  Tr. 295.  Oaks reported that he drank beer every other day, and consumed three or four beers at a time.  Tr. 290.  He testified that alcohol never affected his work history or caused any legal problems for him.  Tr. 291.  Oaks explained that his hobbies included fishing and hunting, but that he had not done either for about a year and a half prior to the hearing because of the ulcers on his feet.  Tr. 296.

### 2.    Vocational Expert's Testimony

Barbara Burk, a vocational expert ("VE"), also testified at the hearing.  Tr. 302-09.  The VE testified that Oaks' past relevant work included the following jobs: greenskeeper, which is a marginally semi-skilled job that is generally performed at a medium exertional level, but was performed by Oaks at a light exertional level; a carpenter, a maintenance carpenter, and a cabinet maker, which are skilled jobs that are generally performed at medium exertional levels, but were performed by Oaks at very heavy exertional levels; and a supervisor of carpenters, which is a highly skilled job that is generally performed at a medium exertional level, but was performed by Oaks at a very heavy exertional level.  Tr. 304.  The VE stated that none of Oaks' carpenter or cabinet maker skills were transferable to sedentary or light work.  Tr. 304.

In a hypothetical, the ALJ asked the VE whether a person could perform any of Oaks' past relevant work if the individual had the same vocational factors as Oaks and was limited to light work that did not require climbing ladders, ropes, or scaffolds, or concentrated exposure to extreme cold.  Tr. 304.  The VE testified that Oaks' job as a greenskeeper, as he was performing

it, i.e., seated on a riding mower, would accommodate the hypothetical limitations.[4]  Tr. 305.

The VE also testified that the individual could perform the following other jobs: a cashier II

(11,000 jobs regionally and 1,020,000 nationally); a hand packager (2,400 jobs regionally and

220,000 jobs nationally), and a fast food worker (5,600 jobs regionally and 389,000 jobs

nationally).  Tr. 305.  In a second hypothetical, the ALJ restricted the work to sedentary work.

Tr. 305.  The VE testified that the person could perform the following other jobs: a telemarketer

(5,000 jobs regionally and 314,000 jobs nationally) and a final assembler (800 regionally and

60,000 nationally).  Tr. 306.

Counsel for Oaks was given an opportunity to question the VE.  Tr. 45.  Counsel asked

the VE if the individual described in the ALJ's hypothetical would be precluded from working if

the person developed foot ulcers that would require surgery two times a year, and that the

individual would need to miss work for ten days for each surgery.  Tr. 306.  The VE stated that

this would be more time off than typically allowed.  Tr. 306.

### III.  Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the

existence of a disability.  "Disability" is defined as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or
> mental impairment or impairments are of such severity that he is not only unable
> to do his previous work but cannot, considering his age, education, and work
> experience, engage in any other kind of substantial gainful work which exists in
> the national economy . . . .

---

[4] The VE testified that the job as greenskeeper would normally require more exertion (e.g., a greenskeeper would
normally need to use hand mowers, as well as riding mowers, and dig and rake the ground) than as it was performed
by Oaks.  Tr. 308-09.

10

42 U.S.C. § 423(d)(2). In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920 (b)-(g); *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987). Under this analysis, the claimant has the burden of proof at steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy. *Id.*

## IV. The ALJ's Decision

In her August 2008 decision, the ALJ found that Oaks had engaged in substantial gainful activity in 2006 and 2007 while working as a seasonal greenskeeper at Prestwick Golf Club. Tr. 20. However, the ALJ continued the sequential evaluation through the remaining step because

there were still unadjudicated periods since the alleged onset date. Under step two, the ALJ found that Oaks had the severe impairments of frostbite and the resulting amputations of all of his toes from both feet. Tr. 21. Under step three, the ALJ found that Oaks did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. pt. 404, Subpt. P , App. 1. Tr. 21. The ALJ next determined that Oaks retained the RFC to perform a range of light work subject to the following limitations: cannot climb ladders, ropes and scaffolds, and should avoid concentrated exposure to extreme cold. Tr. 22. Under step four, the ALJ determined that Oaks was unable to perform his past relevant work, even though she noted in her decision that the VE opined that Oaks could perform his job as a greenskeeper as he had performed it. Tr. 25. Finally, under step five, considering his vocational factors, RFC, and the testimony of the VE, the ALJ found that Oaks was capable of performing work that existed in significant numbers in the national economy. Tr. 25-26. Thus, the ALJ concluded that Oaks was not disabled. Tr. 26.

## V. Arguments of the Parties

Oaks challenges the Commissioner's decision on numerous grounds. First, he argues that the ALJ's finding that he engaged in substantial gainful activity in 2006 and 2007 is not supported by substantial evidence. Second, Oaks argues that the ALJ erred in excluding Oaks' diabetes and peripheral neuropathy as a severe impairment. Third, Oaks asserts that the ALJ erred by not finding that Oaks' diabetes and peripheral neuropathy met or equaled the listings. Fourth, Oaks claims that the ALJ improperly discredited the opinion of Dr. Jopperi under the treating physician rule. Fifth, Oaks argues that the ALJ erred by finding that his testimony was only partially credible. Sixth, Oaks contends that the ALJ denied Oaks the benefit of a "full inquiry" by failing to order a consultative examination or requesting expert medical testimony in

12

light of evidence as to a change in his condition.[5]

The Commissioner argues that substantial evidence supports the ALJ's finding that Oaks had engaged in substantial gainful activity since December 5, 2004, the alleged onset date. Next, the Commissioner argues that substantial evidence supports the ALJ's RFC determination and the weight given to the medical source opinions. Finally, the Commissioner asserts that substantial evidence supports the ALJ's determination that Oaks could perform other jobs available in significant numbers in the national economy.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d

---

[5] Under the briefing schedule set forth by Magistrate Judge William H. Baughman, Jr., to whom this case was originally referred, the Commissioner was ordered to file his brief first, Plaintiff was then ordered to file his brief, and the Commissioner was given the opportunity to file a reply brief. Doc. 12. The Commissioner did not file a reply brief.

383, 387 (6th Cir. 1984).

**A.      Substantial Evidence Supports the ALJ's Decision that Oaks engaged in Substantial Gainful Activity in 2006 and 2007**

At step one of the sequential analysis, the ALJ found that Oaks' seasonal job as a greenskeeper at Prestwick Golf Club during 2006 and 2007 constituted substantial gainful activity ("SGA").  Tr. 20.  Oaks argues that this work was not SGA because his earnings did not meet the threshold earning levels set forth in the guidelines and because his employer made an accommodation to Oaks for his limitations.  Contrary to these arguments, the evidence supports the ALJ's finding that Oaks' employment at the golf course constitutes SGA.

"The Social Security Act provides that an individual who is working and engaged in substantial gainful activity is not entitled to disability benefits." *Bell v. Comm'r of Soc. Sec.*, 105 F.3d 244, 245 (6th Cir. 1996); 42 U.S.C. § 423(f).  Step one of the sequential analysis "is a determination whether the claimant is engaged in substantial gainful activity.  If she is, her claim is rejected without consideration of her medical condition." *Bell*, 105 F.3d at 245–246; 20 C.F.R. §§ 416.920(a), (b).  The claimant bears the burden of showing he was not engaged in SGA. *Warner v. Commissioner of Social Sec.,* 375 F.3d 387 (6th Cir. 2004).

SGA is "work activity that is both substantial and gainful."  20 C.F.R. 404.1572.  Substantial work is "activity that involves doing a significant physical or mental process."  20 C.F.R. § 404.1572(a).  Work can be substantial if it is done on a part-time or seasonal basis. *Id.*  Gainful work is "work activity that you do for pay or profit."  20 C.F.R. § 404.1572(b).  The regulations provide that "generally," earnings are the primary factor in determining if work constitutes SGA.  20 C.F.R. § 404.1574.  A claimant who earns more than a specific amount prescribed by the guidelines set forth in the regulations is presumed to have engaged in SGA.  20 C.F.R. § 404.1574(b)(2)(ii)(B); *Tyra v. Sec'y of Health & Human Servs.,* 896 F.2d 1024, 1029

14

(6th Cir. 1990).  A claimant may rebut this presumption of SGA "by evidence of the nature of

the applicant's work, the conditions of employment and the adequacy of the applicant's

performance." *Dinkel v. Sec'y of Health & Human Servs.,* 910 F.2d 315, 319 (6th Cir. 1990)

(citing 20 C.F.R. § 404.1573).  For the time periods relevant to this case, the amounts necessary

to create the presumption are $860 per month in 2006, $900 per month in 2007, and $940 per

month in 2008.  *See* 20 C.F.R. § 404.1574(b)(2)(ii)(B).

The ALJ determined that Oaks worked seasonally in 2006 and 2007, mowing grass at a

golf course for seven hours a day, five days a week, for a total of 35 hours a week.  Tr. 20.  In

particular, the ALJ found that Oaks was hired one July 24, 2006, and worked until the end of

October 2006, and that he again worked at this job from March 2007 to mid-October 2007.  Tr.

20, 64-66.  The ALJ concluded that the earnings record and testimony confirmed that this work

activity was at substantially gainful levels during the months that Oaks worked and that this

work therefore constituted SGA.  Tr. 64, 66, 287, 291, 298.  Oaks points to nothing in the record

to establish an error in this conclusion.

First, it is undisputed that seasonal work can be SGA.  *See* Social Security Ruling

("SSR") 83-35, 1983 SSR LEXIS 36 (discussing seasonal employment and stating that "[w]hen

the individual worked for a continuous period of time but is no longer working, earnings are to

be averaged over the actual period of work involved.").  Second, as correctly noted by the ALJ,

Oaks' earnings in 2006 and 2007 exceeded the threshold levels set forth in the guidelines.  In

2006, Oaks worked at the golf course from the end of July to mid-October, which was

approximately three months.  His earnings in 2006 were $3,073.82.  If this amount is averaged

over the actual three-month period of work, Oaks' monthly income was $1,024.60, which was

well-above the threshold earning level of $860 per month in 2006.  Likewise, in 2007, Oaks

worked at the golf course from mid-March to mid-October and his earnings were $7,777.00.  If this amount is averaged over the actual seven-month period of work, Oaks' monthly income was $1,111.00, which was again greater than the level set forth in the guidelines.  Accordingly, Oaks is presumed to have engaged in SGA.

In an attempt to rebut this presumption, Oaks claims that his work at the golf course did not constitute SGA because it was accommodated, in that his responsibilities were limited to mowing the grass.  Tr. 308-09.  In other words, Oaks contends that he did not perform the full range of tasks usually performed by someone doing the same work.  The fact that Oaks only mowed grass does not affect his ability to perform substantial work.

A claimant performs SGA when his duties "contribute substantially to the operation of a business."  20 C.F.R. § 416.973(a).  In addition, SGA may be work which "takes into account ... [the] impairment."  20 C.F.R. § 416.973(c).  However, work that involves "minimal duties that make little or no demands on you and that are of little or no use to your employer," does not constitute SGA.  20 C.F.R. § 416.973(c).  For a golf course to operate, the grass must be cut.  Because operating a golf course requires the grass to be cut, Oaks' employer clearly benefited from his work.  It does not matter if his responsibilities were designed to accommodate his abilities.  Oaks' job did not amount to valueless "make work."  He performed a job necessary to the operation of the golf course.  *Skafica v. Sec'y of Health & Human Servs.*, 918 F.2d 179 (6th Cir. 1990) (finding the plaintiff engaged in SGA because operating a restaurant requires clean dishes and the plaintiff's employer benefited from his work as a dish washer - it did not matter that the plaintiff's responsibilities were designed to accommodate his abilities).  Thus, substantial evidence supports the ALJ's finding that Oaks' work at the golf course constituted SGA.

Even though Oaks engaged in SGA after his alleged onset date of December 4, 2004, the first step of the sequential analysis did not prove dispositive in this matter, as the ALJ found that "because there are still unadjudicated periods since the alleged onset date, it is necessary to continue with the sequential analysis." Tr. 20. The ALJ therefore applied the remaining steps of the sequential evaluation procedure to the periods when Oaks was not engaging in SGA.[6]

**B.      The ALJ Failed Adequately to Consider Oaks' Physical Impairments in Reaching Her RFC Determination**

Oaks asserts that the ALJ erred because she failed to adequately consider his physical impairments at both step two and step four of the sequential analysis. Specifically, Oaks contends that his diabetes and peripheral neuropathy worsened in 2007 and 2008, and that this change in his physical condition affected his ability to work. Oaks contends that the ALJ erred because she did not find diabetes and peripheral neuropathy to be severe impairments or properly account for these impairments in her RFC determination. The undersigned agrees that the ALJ committed error in this regard.

As the United States Court of Appeals for the Sixth Circuit has recently noted, an ALJ's decision "must include a discussion of 'findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law, or discretion presented on the record.'" *Reynolds v. Comm'r of Soc. Sec.*, No. 09-2060, 2011 U.S. App. LEXIS 6854, 2011 WL 1228165, at *4 (6th Cir. Apr. 1, 2011) (quoting 5 U.S.C. § 557(c)(3)(A)). The reasons requirement is both a procedural and substantive requirement, necessary in order to facilitate effective and meaningful judicial review. *Id.*

---

[6] Presumably, the periods that the ALJ applied the remaining steps of the sequential analysis to are the periods from December 4, 2004 (the alleged onset date) to July 23, 2006 (the day before Oaks started working at the golf course) and from mid-October 2007 (when Oaks finished working at the golf course) to August 12, 2008 (the date of the ALJ's opinion). The ALJ did not find that Oaks' apparent re-employment at the golf course in the spring of 2008 constituted SGA.

At step two of the sequential analysis, an ALJ is required to consider whether the claimant has severe impairments of either a physical or mental nature.  20 C.F.R. §§ 404.1520, 416.920.  The Sixth Circuit has emphasized that the second step is a "*de minimus* hurdle" and that "if an impairment has more than a minimal effect on the claimant's ability to do basic work activities, the ALJ must treat it as severe."  *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 576-77 (6th Cir. 2009).  "Once one severe impairment is found, the combined effect of all impairments must be considered, even if other impairments would not be severe."  *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 190 (6th Cir. 2009) (internal quotations omitted) (holding that an ALJ erred in not considering a claimant's non-severe mental impairments in assessing her RFC); *but see Nejat*, 359 F. App'x at 578 ( "[W]hen an ALJ considers all of a claimant's impairments in the remaining steps of the disability determination, an ALJ's failure to find additional severe impairments at step two does not constitute reversible error.").

In this case, even though the ALJ did not find Oaks' diabetes or peripheral neuropathy to be severe impairments, she did determine that Oaks had the severe impairment of frostbite and the resulting amputations of all of his toes.  For a claimant to advance beyond step two, an ALJ need only find that the claimant has one severe impairment. *Maziarz v. Sec'y of Health and Human Services,* 837 F .2d 240, 244 (6th Cir. 1987).  Because the ALJ found that Oaks had at least one severe impairment, Oaks would not have realized a different result at step two even if the ALJ had found that his diabetes and peripheral neuropathy were severe impairments.  The analysis turns, then, to whether the ALJ adequately evaluated and accounted for all of Oaks' impairments in her RFC analysis and findings.

It is unclear, based on the ALJ's articulation, whether she adequately evaluated and accounted for all of Oaks' physical impairments in assessing his RFC.  Oaks was first diagnosed

with diabetes in December 2004 when he was treated for frostbite.  In 2005 and 2007, Oaks was

treated by Dr. Graham for ulcers on his feet.  Tr. 160-61, 248-49.  In 2007, Dr. Graham referred

Oaks to Dr. Grossman, a podiatric surgeon, for treatment of Oaks' chronic foot ulcers.  Tr. 250.

Dr. Grossman was the first treating physician to associate Oaks' ulcers with his uncontrolled

diabetes - he diagnosed Oaks with chronic neuropathic ulceration in August 2007.  Tr. 236.  By

December 21, 2007, Dr. Grossman noted that Oaks had dense sensory neuropathy on both feet,

as well as keratosis at the plantar aspect of the neuropathic wounds bilaterally.  Tr. 260.  In

January, 2008, Oaks underwent a revised transmetatarsal amputation, and was scheduled for a

third surgery the week after the administrative hearing.  Tr. 258, 260, 287.

  To reach her RFC determination, the ALJ relied heavily on the assessments of Dr. Fink,

which were completed in 2005.  Dr. Fink opined that Oaks was not disabled, but this opinion was

based solely on Oaks' condition after his toes were amputated.  There is no indication that Dr.

Fink considered Oaks' diabetes or peripheral neuropathy in formulating his opinion.

Considering this fact, the ALJ only briefly mentioned these impairments in her RFC analysis,

and omitted any discussion of Oaks' condition after 2005 even though it was clear by 2007 that

his peripheral neuropathy was the cause of the ulcers on his feet and that this condition had

become chronic.  The ALJ also failed to mention the medical evidence from Dr. Grossman or Dr.

Graham, which shows that Oaks' condition worsened after 2005.  Thus, the ALJ's analysis does

not provide any firm indication that she accounted for Oaks' diabetes and neuropathy in

assigning his RFC.  And, although the ALJ is not required to discuss every piece of evidence in

the record, *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989), her

failure in this case to even acknowledge the change in Oaks' condition or discuss the medical evidence relative to his diabetes and peripheral neuropathy was clear error.[7]

The ALJ also ignored or mischaracterized important limitations when discussing Oaks' activities of daily living. For example, in finding that Oaks' assertions that he has difficulty standing are belied by his activities of daily living, the ALJ noted that Oaks worked seven hours a day mowing lawns, but ignored the fact that all of this work was done while Oaks was seated on a riding mower. Tr. 24, 291. In addition, the ALJ cited that Oaks took care of a dog, but ignored his testimony that his brother has to walk the dog. Tr. 24, 294-95. Further, the ALJ stated that Oaks occasionally hunted, but ignored his testimony that he had not hunted for a year and a half because of the ulcers on his feet. Tr. 296. The ALJ's analysis was therefore flawed because she did not adequately evaluate whether, for the period after 2005, Oaks' diabetes and peripheral neuropathy created additional limitations.

In sum, the evidence in the record indicates that Oaks' diabetes and peripheral neuropathy worsened after 2005. The ALJ did not adequately evaluate the evidence after 2005 to determine whether the change in Oaks' condition created additional limitations on his ability to work. While the ALJ's determination may ultimately be supported by substantial evidence, the Court cannot make that determination because of the ALJ's failure to provide adequate reasons for her decision, thus preventing meaningful review. For that reason, the Commissioner's decision should be reversed and remanded.

---

[7] This is not to say that the ALJ was required to provide a more restrictive RFC. Under the circumstances of this case, however, the ALJ was required to provide sufficient analysis to indicate that the RFC accounted for all of Oaks' physical impairments.

**C.      Whether the ALJ Erred Under Step Three**

Oaks also argues that the ALJ erred at step three of the sequential evaluation because she did not address or discuss Listing 11.14, which is the listing for peripheral neuropathies. Oaks claims that his neuropathic impairments meet and/or equal the severity requirements of Listing 11.14. As set forth above, there is ample evidence that Oaks suffers from neuropathic impairments, yet the ALJ failed to address Listing 11.14 in her step three analysis. Because remand is appropriate for the reasons set forth above, the ALJ should consider whether Oaks' impairments meet and/or equal Listing 11.14.

**D.      Remaining Issues**

**1.      Whether the ALJ Conducted a Full and Fair Inquiry**

Oaks argues that the ALJ's decision is not supported by substantial evidence because she failed to conduct a full inquiry into his impairments. Doc. 17, pp. 17-20. Oaks claims the ALJ should have ordered another consultative examination or requested expert medical testimony at the hearing before making a disability determination in this case. Doc. 17, pp. 17-20.

It is well-recognized that an ALJ has an affirmative duty to develop a full and fair record in Social Security proceedings due to their non-adversarial nature. *See Heckler v. Campbell*, 461 U.S. 458, 471, 103 S. Ct. 1952, 76 L. Ed. 2d 66 (1983) (Brennan, J., concurring); *see also Richardson v. Perales*, 402 U.S. 389, 410, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) ("an examiner [is] charged with developing the facts"). The ALJ's duty to develop the record, however, is balanced with the fact that "[t]he burden of providing a complete record, defined as evidence complete and detailed enough to enable the Secretary to make a disability determination, rests with the claimant." 20 C.F.R. §§ 416.912, 416.913(e); *Landsaw v. Sec'y of H.H.S.*, 803 F.2d 211, 214 (6th Cir. 1986). With this in mind, the regulations specify that "[a]n ALJ has discretion

to determine whether further evidence, such as additional testing or expert testimony, is necessary." *Foster v. Halter,* 279 F.3d 348, 355 (6th Cir. 2001) (citing 20 C.F.R. §§ 404.1517, 416.917); *Landsaw v. Sec'y of Health & Human Servs.,* 803 F.2d 211, 214 (6th Cir. 1986). Furthermore, the Sixth Circuit has determined that, although the ALJ is required to conduct a "full inquiry" into the issues before rendering a decision, the ALJ is not required to order additional evidence, such as a consultative examination, unless doing so "is *necessary* for the ALJ to render a disability decision." *Id.* (emphasis in original).

As explained above, there is evidence that Oaks' condition deteriorated in 2007 and 2008. Dr. Fink completed his assessments of Oaks' physical condition on June 9, 2005 (Tr. 156) and October 18, 2005 (Tr. 155) and opined in both instances that Oaks was not disabled. However, these opinions were based solely on the amputation of Oaks' toes due to his frostbite. Tr. 155-56. Dr. Fink's opinions do not account for the change in Oaks' condition in 2007 and 2008. Because Dr. Fink's opinions do not accurately account for all of Oaks' limitations, Oaks argues that, pursuant to 20 C.F.R. § 404.1519a(b),[8] the ALJ should have ordered another consultative examination in 2007 or 2008 or had a medical expert testify at the hearing to address the changes in his condition and how the changes affected his ability to work. Doc. 17, p. 20. Because remand is already appropriate, on remand, the ALJ should consider whether it is

---

[8] 20 CFR § 404.1519a(b) states:

(b) Situations requiring a consultative examination. A consultative examination may be purchased when the evidence as a whole, both medical and nonmedical, is not sufficient to support a decision on your claim. Other situations, including but not limited to the situations listed below, will normally require a consultative examination:

(1) The additional evidence needed is not contained in the records of your medical sources;

(2) The evidence that may have been available from your treating or other medical sources cannot be obtained for reasons beyond your control, such as death or noncooperation of a medical source;

(3) Highly technical or specialized medical evidence that we need is not available from your treating or other medical sources;

(4) A conflict, inconsistency, ambiguity or insufficiency in the evidence must be resolved, and we are unable to do so by recontacting your medical source; or

(5) There is an indication of a change in your condition that is likely to affect your ability to work, but the current severity of your impairment is not established.

*necessary* to have a state agency physician review the record to assess Oaks' physical functioning after the change in his condition in 2007 and 2008, or obtain any other evidence, in order to render a disability determination.  *Landsaw,* 803 F.2d at 214.

> **2.**     **The ALJ's Evaluation of Medical Source Opinions and Oaks' Credibility**

The undersigned will not reach the treating physician issue raised by Oaks because, on remand, the ALJ's evaluation of the evidence might impact her findings under the sequential analysis.  As the Commissioner is aware, however, if the ALJ rejects the opinions of Oaks' treating physician, her reasons "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir. 2009). Similarly, the undersigned will not address Oaks' argument that the ALJ erred in evaluating his credibility because, on remand, the ALJ's evaluation of the evidence may impact her credibility determination.  *See Trent v. Astrue*, Case No. 1:09CV2680, 2011 U.S. Dist. LEXIS 23331, at *19 (declining to address the plaintiff's remaining assertion of error because remand was already required and, on remand, the ALJ's application of the treating physician rule might impact his findings under the sequential disability evaluation).

## VII.  Conclusion and Recommendation

For the foregoing reasons, the final decision of the Commissioner denying Plaintiff Edwin C. Oaks' applications for DIB and SSI should be REVERSED and REMANDED.[9]

Dated: January 17, 2012

_____
Kathleen B. Burke
United States Magistrate Judge

---

[9]  This report and recommendation should in no way be construed as an advisory opinion in favor of a finding of disability on remand.

## **OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); s*ee also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).